UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                                    **ORDER**
                                                                    25-CR-65 (JMA)

         -against-

BILLON McLEOD,

                                                 Defendant.
------------------------------------------------------------------------X

**AZRACK, United States District Judge:**

Defendant, Billon McLeod, is charged by superseding indictment with three counts of coercion/enticement of a minor, 18 U.S.C. § 2422(b); three counts of sexual exploitation of a minor, 18 U.S.C. § 2551(a); and one count of attempted sexual exploitation of a minor, 18 U.S.C. § 2551(a). (ECF No. 29.) Currently pending before the Court are various pretrial motions filed by the parties. The Court's rulings on these motions are set out below.

**A. Suppression Motion**

Defendant had moved to suppress various statements that he made to federal agents on February 7, 2025, both before and after his arrest. (Def.'s Mem. Supp. Mot. Suppress ("Mot."), ECF No. 39; see Gov't Mem. Opp'n Def.'s Mot. Suppress ("Gov't Opp'n"), ECF No. 43; Def.'s Reply Supp. Mot. Suppress ("Reply"), ECF No. 46.)

1. **Background**[1]

Early in the morning of February 7, 2025, federal law enforcement agents executed a search warrant on Defendant's apartment in Brooklyn. After entering the building, the agents knocked on the door to Defendant's apartment and instructed him to open the door. (Def. Ex. A.) When Defendant did not immediately comply, the agents forcibly entered the apartment. (Id.) Defendant was briefly restrained and handcuffed in the hallway outside the apartment while his mother was escorted to the other end of the hall. (Def. Ex. C.) Defendant was subsequently escorted to a bedroom inside the apartment. (Def. Ex. B ¶ 3.) While the search was ongoing, Defendant was joined in the bedroom by multiple FBI agents, including Special Agent Alexandra Chacon and Special Agent Matthew Deragon, who created an audio recording of the conversation that followed. (See Def. Ex. D.) The handcuffs had been taken off Defendant by the time the recording of this conversation with Defendant began.[2]

The agents began by informing Defendant that he was not presently under arrest and that he did not have to answer any questions. (Id. at 4:9–17.)[3] The agents then asked, "you understand right now that you're not under arrest, and you don't have to answer any questions that we ask

---

[1] The following facts are taken from the parties' papers and exhibits thereto, including several recordings and transcripts of the events in question, and the testimony adduced at the December 1, 2025 suppression hearing. (See Def. Ex. A (video recording of body-worn camera produced at EDNY_00593); Def. Ex. B (Affirmation of Billon Mcleod); Def. Ex. C (video recording of body-worn camera produced at EDNY_00594); Def.'s Ex. D (audio recording of pre-arrest questioning produced at EDNY_000001; Def.'s Ex. E (FBI Form FD-302 produced at EDNY_0044512); Def. Ex. F (video recording of interrogation at FBI building produced at EDNY_000002); see also Tr., Hearing Dec. 2, 2025 ("Hr'g Tr.").)

[2] The audio transcript does not explicitly state that Defendant was no longer in handcuffs when this conversation began. However, the Court finds, based on the entirety of the recording, that Defendant was no longer in handcuffs at that time. Defendant was explicitly told, at the outset of this recording, that he was not under arrest, and, in response, Defendant did not say anything about handcuffs. Later in the conversation, Defendant even asked the agents "if I open my phone, are you putting me in cuffs because of my phone," which further confirms that Defendant was not in handcuffs at the time. (Ex. D at 92.)

[3] All citations to the recordings filed as defense exhibits refer to page and line numbers of the transcripts thereof, which were provided by Defendant—not the recording timestamps. References to features of the recordings that are not reflected in the transcript are explicitly noted as "timestamp".

2

you[?]," to which Defendant replied "correct . . . I understand the idea I can provoke [sic] the idea of a lawyer[,]" and expressed a desire to "understand what is going on." (Id. at 6:7–22.)

The agents proceeded to explain the basis for the search warrant and inquired about Defendant's relationship with an alleged minor victim, Jane Doe #1. (Id. at 7:5–23; 8:11–25, 10:1–17.) The agents reiterated, however, that Defendant could decline to answer their questions or comply with their requests. (See id. at 87:2–88:7.) At several points when Defendant became uncooperative, the agents indicated that they were ready to terminate the conversation, but Defendant urged them to continue speaking to him. (Id. at 89:9–25; 95:21–96:6; 97:2–14.) Eventually, Defendant agreed to let the agents unlock and review the contents of his cell phone. (See id. at 120:21–23.)

During the recorded conversation, the search of Defendant's residence was ongoing. (Hr'g Tr. 3.)

At various points during conversation, Defendant asked to speak with his mother and the agents declined to bring her into the bedroom or allow Defendant to speak with her. (Def Ex. D at 10:24–11:24; 76:2–77:13; 53:10–55:9.)

At one point towards the end of the conversation, Defendant asked if he was "going to be able to stay in [his] home and eat," or whether he was "being detained." (Id. 134:12–19.) An agent replied that Defendant was "not free to walk around this house just yet," to which the Defendant stated, "I totally get that at this point." (Def. Ex. D at 134:22–135:2 (emphasis added).) After roughly an hour, the agents handcuffed and arrested Defendant. (Id. 140:3–17.)

Defendant was subsequently transported to the New York FBI Office at 290 Broadway by S.A. Chacon, who was seated in the back seat with Defendant, and Special Agent Thomas Jacques

3

Jean-Pierre, who was driving.[4] (Hr'g Tr. 6:22–8:22.) During this first transport ride, S.A. Chacon advised Defendant of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), multiple times. (Hr'g Tr. 9:5–15.) Defendant responded that he "understood" and then, during this ride, "continued going on a rant and talking about several things." (Hr'g Tr. 9:5–10:6.)

After arriving at the FBI office, Defendant was placed in an interrogation room; the ensuing interrogation was recorded on video. (Def. Ex. F.) Defendant was again advised of his Miranda rights, after which the following exchange took place:

| | |
|---|---|
| S.A. Chacon: | Do you understand your rights? |
| Defendant: | Yes, but I – yes, I do. |
| S.A. Chacon: | Okay. |
| Defendant: | My question -- can I just ask you a question? |
| S.A. Chacon: | Okay. But if you want to talk to me -- |
| Defendant: | And I have to waive my rights to speak to you even now while we're in the room together? |
| S.A. Chacon: | Yes. Yes, because you are under arrest. |
| Defendant: | You just said that in the car. You just said that here. |
| S.A. Chacon: | Because you are under arrest. |
| Defendant: | I just asked you about the duration. You said that if I waive my rights in the car. And now it's the entirety – |
| S.A. Chacon: | No. You asked me if you had to. I said, "You don't have to waive your rights." |
| Defendant: | So I'm never going to be able to speak to you because I'm – |

---

[4] At the December 2 Hearing, S.A. Jean-Pierre testified about Defendant's transport from his residence to the FBI Office and his subsequent transport from the FBI Office to the courthouse. My findings of fact concerning these events are based on S.A. Jean Pierre's testimony, which I found credible, along with other evidence in the record.

4

| | | |
|---|---|---|
| S.A. Chacon: | | You -- you -- |
| Defendant: | | -- not comfortable waiving my rights. |
| S.A. Chacon: | | Okay. |
| Defendant: | | That sounds ridiculous. |
| S.A. Chacon: | | Okay. If you don't waive your rights, then you understand your rights. That's all I – that's all I care about. Do you understand your rights? |
| Defendant: | | Yeah. |
| S.A. Chacon: | | It's a simple question. If you understand, that's fine (indiscernible). |

(Def. Ex. F. at 5:20–8:4.) During this exchange, Defendant was presented with an FD-395 Advice of Rights form, which he did not sign. (Def. Ex. F; Def. Ex. G (Form FD-395 produced at EDNY_004515).)

As explained infra, at the end of this exchange, Defendant pauses for approximately eight seconds, and then proceeds to speak, stating: "Oh. Ma'am, this is an FBI building. I'm here because I have a relationship with [Jane Doe #1]. This is my end game. . . . You really think that's what I'm trying to do? Man, you just went through the house. There's nothing . . . explicit." (Def. Ex. F at 8:5–13.)

The agents then asked Defendant questions about his relationship with Jane Doe #1. (Id. at 8:19.) Defendant then continued to speak and answer various questions posed about Jane Doe #1 and other matters. (Id. passim.) After roughly forty-five minutes, Defendant asked for a lawyer and the agents stopped the interrogation, notwithstanding Defendant's subsequent request, after this invocation, to speak to the agents further and answer more questions. (Id. at 77:20–80:19.)

After the post-arrest interrogation was terminated, S.A. Jean-Pierre drove Defendant and S.A. Chacon to the EDNY courthouse in Brooklyn. (Hr'g Tr. 11:9–22.) The agents did not

5

question Defendant while they were in the vehicle. (Id. at 11:23–25.) Defendant, however, made various additional statements "without any prompting." (Hr'g Tr. 12:2–4.) As S.A. Jean-Pierre credibly explained at the hearing, he was with Defendant for over eight hours and during that "entire time he was talking"—a point that was corroborated by the video and audio recordings in the record. (Hr'g Tr. 14:11.)

In a sworn affidavit, Defendant—who did not testify at the hearing—maintained that he was subjected to further questioning during the ride to the courthouse. (See Def's Ex. B ¶ 10.) The Court does not credit that affidavit. Defendant's assertion is contradicted by the credible testimony of S.A. Jean-Pierre.

Upon arriving at the courthouse, Defendant was arraigned on a complaint and detained pending trial. (ECF Nos. 2 & 7.) On June 17, 2025, a grand jury returned the operative superseding indictment, which includes counts involving Jane Doe #1 as well as three additional Jane Doe victims. (ECF No. 29.)

On August 1, 2025, Defendant filed the instant motion to suppress evidence of his statements to the FBI agents throughout the day of his arrest on the grounds that those statements were obtained in violation of the Fifth Amendment. (ECF No. 39.) The Government filed its response in opposition to the motion on October 1, 2025, and Defendant filed a reply on October 10, 2025. (ECF Nos. 43 & 46.) I presided over a hearing on the motion on December 2, 2025. (ECF No. 71.)

**2. Analysis**

Defendant moved to suppress evidence of statements he made during three different phases of his interaction with the FBI agents on February 7, 2025.

*i. Pre-Arrest Statements*

Defendant first moved to suppress statements made during the pre-arrest interrogation that occurred in the bedroom of his residence because he was not read his Miranda rights prior to questioning. (Mot. at 6–11.) At the beginning of the suppression hearing, the Court indicated that this exchange was not custodial and, as such, Miranda warnings were not required. (Hr'g Tr. 3.)

Subsequently, in the Government's December 5, 2025 letter, the Government explained that the only the statements the Government "may seek to elicit" from this pre-arrest interview are Defendant's statements "in sum and substance that Jane Doe 1 was his friend and that she was a 'younger girl.'" (ECF No. 73 at 5.) Given that the Government seeks to only admit these very limited statements and the question of whether Defendant was in custody during this exchange is a close one, the Court is inclined to simply exclude this evidence. The Government shall inform the Court, by 10 p.m. on December 13, 2025, whether it still seeks to introduce this evidence in its case-in-chief.

*ii. Post-Arrest Interrogation at the FBI Office*

Defendant also moved to suppress statements that he made during the post-arrest interrogation at the New York FBI office. (Mot. at 11–13.) Defendant argues that: (1) he invoked his Miranda rights at the start of the interrogation and (2) any subsequent waiver was not knowing. (Id.) Defendant's argument, however, is belied by the video recording of the interrogation. (Def. Ex. F.)

After Miranda warnings have been given, if an individual invokes his right to remain silent or speak with an attorney, the interrogation must cease. United States v. O'Brien, 926 F.3d 57, 73 (2d Cir. 2019); Miranda, 384 U.S. at 473–74). "In order to require that questioning cease, the accused must assert his right affirmatively and unambiguously." O'Brien, 926 F.3d at 73.

7

However, even if a suspect does not unambiguously invoke his rights, a statement elicited during a custodial interrogation may not be admitted at trial unless the government can establish, by a preponderance of the evidence, that the suspect in fact knowingly and voluntarily waived his rights when making the statement. Berghuis v. Thompkins, 560 U.S. 370, 383 (2010). To be "knowing," a waiver "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Plugh, 648 F.3d 118, 127 (2d Cir. 2011) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).

Having viewed the recording of the interrogation in question, I find that Defendant did not unambiguously invoke his Miranda rights. While it is true that Defendant declined to sign the Advice of Rights form, the law is clear that refusal to sign a waiver is not sufficient to "establish an unambiguous invocation." Plugh, 648 F.3d at 128. Nor was his statement that he was "not comfortable waiving [his] rights" an unambiguous invocation—especially when coupled with his desire to speak with the agents and his decision only moments later to start speaking to the agents about the case before they had asked him any substantive questions. (See Def. Ex. F at 7:4–25.) At no point did Defendant state that he wanted to remain silent or refused to answer any questions, and, when he ultimately did request a lawyer, the questioning ceased. (See id. at 80:1–81:25.)

Defendant, however, also insists that his waiver was not "knowing." Defendant argues that his statements at the beginning of the interrogation contain "indicia of misunderstanding" about his rights.[5] (Mot. at 13.) Defendant contends that, on the video, his "insistence that he was not intending to waive his rights while continuing to answer questions from the agents" shows that he did not understand this rights. (Id.) While I agree that the record reveals a struggle between two

---

[5] Defendant does not argue that the waiver was involuntary or coerced. (See Mot. at 12–13.)

8

conflicting desires—the desire to talk and the desire to remain silent—the evidence does not show that Defendant was confused about the nature of his rights or the consequences of waiving them.

None of the statements Defendant made at the FBI Office establish that he misunderstood his rights when he waived those rights and spoke to the agents during this interrogation. Rather, the record affirmatively establishes that Defendant's waiver of his rights was "knowing."

Even before arriving at the FBI Office, Defendant received Miranda warnings while being transported from his residence and he affirmatively stated that he understood those warnings. That admission is compelling evidence that Defendant understood his rights when he spoke to the agents during this car ride and, subsequently, at the FBI Office.

At the FBI Office, Defendant was again given Miranda warnings and again stated that understood them. (Def. Ex. F. at 6:1–14.) Defendant then asked if he had to waive his rights in order to speak with the agents "now while [they were] in the room together" at the FBI Office, to which S.A. Chacon responded "Yes." (Id. at 6:23.).

Shortly thereafter, Defendant told the agents: "So I'm never going to be able to speak to you because I'm . . . not comfortable waiving my rights" and "[t]hat sounds ridiculous." (Id. at 7:15–19.) Defendant's contention that this statement shows he misunderstood his rights is not persuasive.

Immediately thereafter, Defendant was asked if he understood his rights and responded "Yeah." (Id. at 8:1.) That is further evidence that Defendant did, in fact, understand his rights.

Moreover, Defendant's conduct on the video is compelling evidence that his subsequent waiver was knowing. During this exchange with S.A. Chacon, Defendant pauses for approximately eight seconds and only then begins to talk to the agents about Jane Doe #1 and the

9

case against him.⁶ (Id. at timestamp 13:11–13:19.) This pause is notable. I find that, despite his earlier statement about not being "comfortable waiving [his] rights," Defendant subsequently paused, mulled over whether to talk to the agents, and then decided to proceed, The video recording does not show a person who was confused or unsure about his rights. Rather, the video shows an individual who—with knowledge and understanding of those rights—decided, after pausing to deliberate and reflect about the matter, to waive those rights and speak to the agents. I find, based on the video and the entire record, that Defendant did not speak to the agents because his misunderstood his rights; he spoke to them because he believed that he could talk himself out of his predicament and wanted to learn more about the Government's case against him. While Defendant had, moments earlier, stated "[s]o I'm never going to be able to speak to you because I'm . . . not comfortable waiving my rights," after further reflection, he decided to speak to the agents. Given all the evidence in the record, I find that the Government has met its burden to establish that Defendant's waiver of his rights was knowing.⁷

Defendant also contends that later statements on the video recording evince his purported lack of understanding about his rights. Not long after he waived and began speaking at the FBI Office, the agents showed Defendant certain text messages that he proceeded to read out loud. (Id. at 24:20–25:6.) When the agents then asked Defendant to read other apparently incriminating text messages out loud, Defendant refused. (Id. at 25:4–25:18.) The following exchange ensued:

---

⁶ As noted in the transcript, Defendant said "Yeah" after he was asked if he understood his rights. (Id. at 8:1.) Moreover, even if Defendant had not made this statement, Defendant's other conduct described above—including his pause and reflection as well as his earlier affirmative statement during the car ride that he understood his rights—convinces the Court that Defendant's waiver was knowing.

⁷ Defendant's reliance on United States v. Sultanov, 742 F. Supp. 3d 258, 305 (E.D.N.Y. 2024), is misplaced. The defendant in Sultanov had limited English proficiency, stated "50/50" when asked if he understood the Miranda warnings, and made other statements suggesting that he did not understand his rights, id. at *275; see also id. at *275 ("So I do not understand . . . .").

10

    S.A. CHACON: Can you -- can you read it out loud? You were reading this one perfectly fine.

    MCLEOD: Ma'am, because now you're –

    S.A. CHACON: Can you read it?

    MCLEOD: -- asking me to incriminate myself.

    S.A. CHACON: I'm not incriminating you.

    MCLEOD: It's almost as if you think I'm stupid.

    S.A. CHACON: This is (indiscernible). I'm not (indiscernible).

    MCLEOD: It's almost as if you're like, hey, you read point A. Why not read point B? You don't read point B unless it means something to you. Actually, what I'm doing is not incriminating myself.

    S.A. CHACON: Okay. And that's fine.

    MCLEOD: I'm pleading the fifth. Not incriminating myself.

    S.A. CHACON: Good. And you have the right.

    MCLEOD: That doesn't make any sense what you're asking me to do.

    S.A. CHACON: You have the right.

    MCLEOD: Waive my rights, read lines that are not my own. Ma'am, I just showed you in the -- oh, I can make a timeline to show you how frigging dumb this shit seems. . . .

    (Id. at 25:19–26:25.)

This exchange does not indicate that Defendant misunderstood his rights and the consequences of his waiver. Rather, it shows the opposite. I find that this exchange shows that Defendant understood his rights and what waiving those rights entailed, including: (1) the fact that any incriminating statements he made could be used against him; and (2) that he could refuse to talk to the agents and to answer questions they posed. While Defendant said "[t]hat doesn't make any sense what you're asking me to do," that remark does not—as Defendants contends—indicate any

11

confusion about his rights. S.A. Chacon wanted Defendant to read apparently incriminating texts out loud that he claimed were "not [his] own." (Id. at 26:24–25.) Defendant refused to do so, telling S.A. Chacon that what she wanted him to do did not "make any sense." (Id. at 25.) That statement clearly concerned S.A. Chacon's line of questioning—which Defendant viewed as a trick question and rebuffed—and does not indicate that Defendant was confused about his rights.

Other statements by Defendant also show that he understood his rights, including the fact that he eventually invoked his right to counsel at the FBI Office.[8]

Having reviewed a complete recording of the interrogation and considered all the other evidence in the record, it is clear to me that Defendant wanted to explain himself to the agents. Viewing all his statements in context, I find it was Defendant's desire to try to explain his version of events and to learn about the case against him that led him to answer the agents' questions—not any confusion about the nature of his rights. Because Defendant chose to speak freely, with full awareness of his rights and the consequences of abandoning them, Plugh, 648 F.3d at 127, Defendant's suppression motion concerning his statements at the FBI Office is denied.

### iii. Post-Invocation Statements During Transport to the Courthouse

Finally, Defendant moved to suppress statements to the agents during the second transport from the FBI Office to the courthouse. (Mot. at 14–15.) It is undisputed that Defendant had unambiguously invoked his right to counsel at the FBI Office, thus triggering the protections of Edwards v. Arizona, 451 U.S. 477 (1981). Whether evidence of Defendant's post-invocation

---

[8] Even during his pre-arrest questioning, when Defendant was told he could "stop answering questions," Defendant indicated that he knew that he could request a lawyer if he wanted one. (Def. Ex. D at 6:15–22 ("I understand I can provoke the idea of a lawyer").)

statements may be admitted at trial therefore depends on whether they were made spontaneously, or in response to questioning by the agents. I find that Defendant's statements were spontaneous.

Edwards dictates that "a subject who has invoked his right to counsel cannot be 'subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication[.]'" United States v. Gogic, 770 F. Supp. 3d 529, 537 (E.D.N.Y. 2025) (quoting Edwards, 451 U.S. at 484–85). Incriminating statements obtained in violation of that rule are "presumed to be compelled and are therefore excluded for the purposes of the prosecution's case in chief." Id. However, Edwards does not apply to spontaneous statements that are "volunteered" in the absence of police questioning. 451 U.S. at 486; see United States v. Choudhry, 24 F. Supp. 3d 273, 279–80 (E.D.N.Y. 2014), aff'd, 649 F. App'x 60 (2d Cir. 2016) "An arrestee who invokes his right to counsel, but then initiates an unsolicited conversation with police, cannot successfully suppress those statements from trial." Id. at 279. The Government has the burden of proving, by a preponderance of the evidence, that a defendant's statements were spontaneous, rather than the product of interrogation. United States v. Alleyne, 573 F. Supp. 3d 861, 875 (E.D.N.Y. 2021).

Considering the totality of the evidence, I find that Defendant spoke spontaneously during the second transport ride. I credit S.A. Jean-Pierre's testimony that Defendant was not questioned by either agent during the car ride from the FBI Office to the courthouse. S.A. Jean-Pierre's testimony on this point is corroborated by Defendant's conduct on the audio and video recordings and is also consistent with S.A. Jean-Pierre's other credible testimony indicating that Defendant

13

spoke continuously and impulsively during both car rides that day. (Hr'g Tr. at 9:14–16, 12:14–13:3, 24:4–7.)

Having heard S.A. Jean-Pierre's testimony and having reviewed the audio and video recordings from the day of the arrest—during which Defendant talked continuously and frequently interrupted or ignored the agents—I have no doubt that Defendant acted similarly in the car and made spontaneous statements that were not prompted by any questioning from the agents.

I do not credit Defendant's July 30, 2025 affidavit, which states that "[w]hile being transported, the agents continued to question me." (Def. Ex. B ¶ 10.) Defendant did not testify at the suppression hearing. Weighed against the credible and corroborated testimony of S.A. Jean-Pierre, I do not credit Defendant's bare and self-serving assertion affidavit, which was not subject to cross-examination.

Finally, Defendant also argues that any spontaneous statements he made during this car ride should be suppressed because he did not properly understand his rights and did not knowingly waive them at the FBI Office. (ECF No. 46 at 7–8.) This argument fails because, as explained in the discussion of Defendants' statements at the FBI Office, his waiver was knowing.

Given the above, the Court denies Defendant's suppression motion concerning the statements he made during this car ride from the FBI Office to the courthouse.[9]

## B. Defendant's Motion in Limine Concerning Whether Knowledge of Minor Status is an Element for the Coercion/Enticement Counts under § 2422(b)

The parties dispute whether, for the Coercion/Enticement Counts under 18 U.S.C. § 2422(b), Defendant's knowledge of a victim's minor status is a required element. Defendant is

---

[9] It is not clear that Defendant has moved to suppress statements that he made during the first transport from his residence to the FBI Office. To the extent that Defendant has moved to suppress such statements, that motion is also denied. During the first transport, Defendant was advised of his Miranda rights, stated that he "understood," and then proceeded to speak. Accordingly, none of Defendant's statements during the first transport should be suppressed.

14

charged with violating § 2422(b) in Count One (Jane Doe #1), Count Three (Jane Doe #2), and Count Six (Jane Doe #4). Defendant maintains that, for these counts, the Government must prove that he knew or believed that the victim was a minor. (See ECF Nos. 47, 53, 62-2.) The Government disagrees. (ECF No. 51.)

The parties do agree that to establish the commission of a completed Sexual Exploitation offense under 18 U.S.C. § 2251(a), the Government is not required to prove that Defendant knew or believed that the victim was a minor. Defendant is charged with committing completed Sexual Exploitation offenses under § 2251(a) in Count Two (Jane Doe #1), Count Four (Jane Doe #2), and Count Seven (Jane Doe #4). The parties also agree that to establish the commission of an attempted Sexual Exploitation offense under 18 U.S.C. § 2251(e), the Government must prove that Defendant knew or believed that the victim was a minor. (ECF Nos. 51 at n.1, 62-2.) Defendant is charged with attempted Sexual Exploitation under § 2251(e) in Count 5 (Jane Doe #3).

The Government's October 28, 2025 letter as well as the Government's November 4, 2025 omnibus motion in limine, (ECF No. 54), appeared to assert that if the Court were to accept the Government's interpretation of § 2422(b), then Defendant should be precluded from "offering evidence and argument" that he did not know the ages of Jane Does #1, #2, and #4, and that Defendant should only be permitted to offer such "evidence and argument" concerning Jane Doe #3. (ECF No. 51 at n.1.)

However, in the proposed jury instructions submitted by the Government on November 24, 2025, the Government explicitly requests that the jury be instructed, in the alternative, that for Counts Two, Four, and Seven, Defendant can be convicted of attempted Sexual Exploitation of Jane Does #1, #2, and #4, respectively, provided that the jury finds, inter alia, that the defendant knew or believed that the victim was a minor. (Defendant agrees with this general approach, but

15

disagrees about the specific phrasing of this element for these attempt charges). The upshot of this clarification by the Government concerning Counts Two, Four, and Seven is two-fold. First, because attempted Sexual Exploitation requires that the Government prove that Defendant knew or believed that the victim was a minor, Defendant must, necessarily, be permitted to offer evidence about his knowledge (or lack thereof) concerning the ages of Janes Does #1, #2, and #4. Second, and relatedly, because the Government must make this showing to establish attempted Sexual Exploitation under § 2251, evidence that the Government seeks to admit concerning Defendant's knowledge or belief as to the ages of Jane Does #1, #2, and #4 would, of course, also be relevant.

The Court will ultimately have to determine whether Defendant's knowledge about a victim's age is an element of the Coercion/Enticement charges under § 2422(b). The instant Order does not resolve that issue, which the Court will address in a separate order. However, given the discussion above, the Court's resolution of that issue concerning § 2422(b) is not necessary to determine what evidence concerning Defendant's knowledge or belief about the victim's ages should be admitted at trial. Both the Government and Defendant may—subject to Federal Rule of Evidence 403 or any other applicable evidentiary rules—offer evidence concerning Defendant's knowledge or belief as to the ages of all four Jane Does.

### C. The Government's Motions in Limine

#### 1. Uncharged Conduct Covered by Federal Rules of Evidence 413 and 414

The Court grants the Government's motion in limine as to this evidence and will permit the Government to introduce all the evidence cited in its motion concerning uncharged victims. The Court has carefully considered Defendant's arguments that this evidence should be excluded

16

under Rule 403, but ultimately finds that the probative value of this evidence is not outweighed by the danger of unfair prejudice, juror confusion, or delay.

Defendant argues, inter alia, that this evidence about additional uncharged victims is needlessly cumulative and unnecessary based on the fact that there are already four victims charged in this case (Jane Does #1–4) and the Government will introduce incriminating text messages and other evidence involving Jane Does #1–4. The Court is not persuaded. As the Government points out, it is anticipated that Defendant will seek to dispute his knowledge of the charged victims' ages as well as his intentions with respect to meeting with and communicating with those victims. The evidence of the uncharged victims is relevant to, inter alia, rebutting such arguments. Additionally, contrary to Defendant's claims, the evidence involving these additional victims is not different in kind from the evidence involving the charged victims. (See Hr'g Tr. 44:15–22.)

Moreover, given the nature of the evidence concerning these additional uncharged victims—which includes a video, a photograph, and text messages recovered from Defendant's own phone—there is not a danger of protracted mini-trials concerning these victims that could delay trial or distract the jury from the charged crimes at issue. And, as the Government points out, the Government does not have to establish that the uncharged victims were, in fact, minors. Evidence—such as text messages—which indicates that Defendant believed the uncharged victims to be minors is also relevant.

The Court is willing to provide a limiting instruction concerning the evidence involving the uncharged victims. Such a limiting instruction will reduce the alleged risk of unfair prejudice Defendant cites, including his concern that, because these are uncharged crimes rather than past convictions, the jury might, in deliberating over the charged crimes, improperly consider the fact

17

that Defendant has not already been punished for his actions involving these additional victims. (Hr'g Tr. 48.)

### 2. Evidence of Marijuana Use

The Court grants the Government's motion in limine as to this evidence and will permit the Government to introduce this evidence. The Court is willing to provide a limiting instruction concerning this evidence.

### 3. Evidence of Alleged Violence Involving Jane Doe 4

The Court denies the Government's motion in limine concerning this evidence. Given the circumstances of Defendant's alleged violent conduct toward Jane Doe 4 and the timing of this incident and Jane Doe 4's statement about her age (which apparently occurred after the alleged coercion and sexual contact), the Court's preliminary determination is that the evidence about the assault should not be admitted. Accordingly, the Government shall not mention this assault in its opening statement. Jane Doe 4, however, may still—without mentioning the assault—testify that she told Defendant about her age at that time.

The Court may revisit this determination depending on the specific evidence introduced, defenses asserted, and questions asked on cross-examination, at trial.

### 4. Certifications Concerning Extractions from Electronic Devices

The Government has indicated that the three agents who signed certifications concerning the extractions of the devices are available to testify. In an abundance of caution, the Court will not rely on the certifications to authenticate the extractions and directs the Government to call these three witnesses at trial.

[redacted]

██████████████████████████████████████████████████

███████████████████████████

**5. Defendant's Exculpatory Statements to Law Enforcement**

As Defendant has requested, the Court reserves ruling on the potential admissibility of any of Defendant's statements to the agents that Defendant seeks to introduce until it becomes clearer what specific portions of Defendant's statements the Government will seek to introduce.

**SO ORDERED.**
Dated:   December 12, 2025
         Brooklyn, New York

                                    /s/ (JMA)
                                    JOAN M. AZRACK
                                    UNITED STATES DISTRICT JUDGE